**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **CITY OF MAPLE HEIGHTS, OHIO,** | ) | |
| **individually and on behalf of all others** | ) | |
| **similarly situated,** | ) | **CASE NO.: 1:20-cv-01872** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE JAMES S. GWIN** |
| | ) | |
| **v.** | ) | **MAGISTRATE JUDGE** |
| | ) | **THOMAS M. PARKER** |
| **NETFLIX, INC.,** *et al.,* | ) | |
| | ) | |
| **Defendants.** | | |

**DEFENDANT NETFLIX, INC.'S OPPOSITION TO**
**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

## TABLE OF CONTENTS

**Page**

I.     STATEMENT OF ISSUES ................................................................................2

II.    PLAINTIFF'S CLASS CERTIFICATION MOTION SHOULD BE DENIED .................2

    A.    The Proposed Class Is Impermissibly Fail-Safe, And Numerosity Is Lacking ...........................................................................................................3

    B.    Plaintiff Is Not An Adequate Class Representative.................................................4

    C.    Plaintiff's Claims Are Not Typical Of Those Of The Proposed Class ...................7

    D.    Plaintiff Has Not Satisfied And Cannot Satisfy Commonality, Much Less Predominance Or Cohesion ........................................................................8

    E.    Class Certification Is Improper Under Rule 23(b)(2) For Additional Reasons ...........................................................................................................14

    F.    Class Certification Is Improper Under Rule 23(b)(3) For Additional Reasons ...........................................................................................................15

        1.    Plaintiff's Damages Method Is Inconsistent With Its Liability Theory ...........................................................................................15

        2.    A Class Action Is Not A Superior Method For Resolving This Dispute ...........................................................................................16

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Allison v. Citgo Petroleum Corp.*,
   151 F.3d 402 (5th Cir. 1998) ................................................................13

*In re Am. Med. Sys.*,
   75 F.3d 1069 (6th Cir. 1996) ..............................................................3, 4

*Amara v. CIGNA Corp.*,
   775 F.3d 510 (2d Cir. 2014)................................................................13

*Amchem Products v. Windsor*,
   521 U.S. 591 (1997).........................................................................6, 16

*Ball v. Kasich*,
   307 F. Supp. 3d 701 (S.D. Ohio 2018) ..................................................6

*Ball v. Union Carbide*,
   385 F.3d 713 (6th Cir. 2004) .............................................................8, 10

*Berry v. Schulman*,
   807 F.3d 600 (4th Cir. 2014) ................................................................13

*Carter v. Arkema, Inc.*,
   2018 WL 1613787 (W.D. Ky. 2018) ....................................................13

*Chubb v. Ohio Bur. of Workers' Comp.*,
   690 N.E.2d 1267 (Ohio 1998).............................................................14

*Citizens for Responsible Green Gov't v. City of Green*,
   118 N.E.3d 236 (Ohio 2018)...............................................................14

*Coleman v. Gen. Motors Acceptance*,
   296 F.3d 443 (6th Cir. 2002) ..........................................................13, 14

*Comcast v. Behrend*,
   569 U.S. 27 (2013)..............................................................................15

*Cox v. TeleTech@Home*,
   2015 WL 500593 (N.D. Ohio 2015) ......................................................6

*Cruson v. Jackson Nat'l Life Ins.*,
   954 F.3d 240 (5th Cir. 2020) ...............................................................15

*Davis v. Cintas Corp.*,
    717 F.3d 476 (6th Cir. 2013) ........................................................................8, 14

*Gooch v. Life Investor Ins. Co. of Am.*,
    672 F.3d 402 (6th Cir. 2012) ..............................................................................13

*Hicks v. State Farm*,
    965 F.3d 452 (6th Cir. 2020) ..............................................................................16

*J.B-K-1 v. Meier*,
    2020 WL 1227761 (E.D. Ky. 2020) ....................................................................13

*Johnson v. Meriter Health Services Employee Retirement Plan*,
    702 F.3d 364 (7th Cir. 2012) ..............................................................................13

*Kohen v. Pac. Inv. Mgmt.*,
    571 F.3d 672 (7th Cir. 2009) ................................................................................8

*Nat'l Endowment for the Arts v. Finley*,
    524 U.S. 569 (1998) ..............................................................................................7

*Petition of NTCA – The Rural Broadband Association and the United States
    Telecom Association for Forbearance Pursuant to 47 U.S.C. § 160(c) from
    Application of Contribution Obligations on Broadband Internet Access
    Transmission Services*, Order,
    33 FCC Rcd 5712 (2018) ....................................................................................12

*Phillips v. Philip Morris Co. Inc.*,
    298 F.R.D. 355 (N.D. Ohio 2014) .....................................................................8, 9

*Pipefitters Loc. 636 Ins. Fund v. Blue Cross Blue Shield of Michigan*,
    654 F.3d 618 (6th Cir. 2011) ......................................................................2, 3, 16

*In re Polyurethane Foam*,
    168 F. Supp. 3d 985 (N.D. Ohio 2016) ...............................................................16

*Randleman v. Fidelity Nat'l Title Ins.*,
    646 F.3d 347 (6th Cir. 2011) ..........................................................................3, 14

*Romberio v. UnumProvident*,
    385 F. App'x 423 (6th Cir. 2009) ...............................................................6, 7, 13

*Sauter v. CVS*,
    2014 WL 1814076 (S.D. Ohio 2014) ....................................................................3

*Schilling v. Kenton Cty., Ky.*,
    2011 WL 293759 (E.D. Ky. 2011) ........................................................................4

*Schlaud v. Snyder*,
  785 F.3d 1119 (6th Cir. 2015) ................................................................4, 7

*Sherrod v. Enigma Software Grp.*,
  2016 WL 25979 (S.D. Ohio 2016) ..............................................................3

*Sprague v. General Motors*,
  133 F.3d 388 (6th Cir. 1998) ..............................................................8, 15

*Still v. Hayman*,
  794 N.E.2d 751 (Ohio Ct. App. 2003) ........................................................14

*Vega v. T-Mobile USA*,
  564 F.3d 1256 (11th Cir. 2009) ...................................................................4

*Wal-Mart v. Dukes*,
  564 U.S. 338 (2011) .............................................................................13, 14

## STATUTES

47 U.S.C.
  § 151 ....................................................................................................7
  § 522(5) ..............................................................................................12
  § 522(7)(C) ..........................................................................................12
  § 522(20) .............................................................................................10
  § 1105(8) ...............................................................................................7

O.R.C.
  § 306.04(C)(15)(a) ................................................................................10
  § 1332.21(I) ..........................................................................................10
  § 1332.21, *et seq.* ................................................................................13
  § 1332.21(J) ....................................................................................*passim*
  § 1332.32(A) ........................................................................................13
  § 1332.32(B)(1) .......................................................................4, 5, 13, 15
  § 1332.32(B)(2)(g) ..................................................................................9
  § 1332.32(C)(1)(b) ...............................................................................8, 9
  § 1332.32(C)(2) .....................................................................................14
  § 1332.32(D) ................................................................................7, 14, 16
  § 5739.02(B)(53) ...................................................................................16
  § 5739.026(F) ........................................................................................16

O.R.C. tit. 5 .................................................................................................4

O.R.C. tit. 7 .................................................................................................4

## RULES

Rule 23(b)(2) .......................................................................................6, 13, 14

iv

Rule 23(b)(3)..............................................................................................................14, 15

## OTHER AUTHORITIES

Centerville, Ohio, *Public Right of Way*, https://www.centervilleohio.gov/
    government/public-works/public-right-of-way........................................................................10

Much like a physical library, Netflix offers an on-demand library of streaming content. Its content is *not* live, linear, channelized, scheduled, or programmed.[1] Users can watch content *anywhere*, *any time*, and *in any amount* they desire so long as they have a broadband Internet connection. The only court to consider the question found Netflix does not provide content comparable to broadcast television programming, Op. & Order (Ex. 9) 12-15, and Netflix has no infrastructure in any Ohio public rights-of-way ("ROWs").

The City of Maple Heights ("Plaintiff") nonetheless seeks to represent a class of "[a]ll municipalities in which one or more of the Defendants has *provided video service*." Pl.'s Mem. (Dkt. 54) ("Mem.") 7. But whether each Defendant *provides video service*, as defined in O.R.C. § 1332.21(J) (the "Act"), is a core *merits* issue. Because determining membership in the class, and thus which entities are bound by a judgment, turns on an adjudication of the merits, the class is improperly defined, and numerosity is lacking.

Plaintiff also fails to establish the other requirements of Rule 23. It is an inadequate class representative, and its claims are not typical. Plaintiff did not consult any other city, yet believes it can strip all other cities of their autonomy to decide whether to increase fees paid by their residents. It then proposes a damages model that would assess fees *only* on Netflix subscribers who *reside* in a city, ignoring that many *non-residents* stream content in that city too. While that model may suit Maple Heights, which has no hotels or tourist attractions, it does detriment to many Ohio cities with college populations, tourism, and business travel. Plaintiff's model also untethers the franchise fee from its supposed purpose of providing "rent" for accessing the public ROWs, as

---

[1] Several factual declarations are submitted herewith to provide relevant background. *See* Long Decl.; Gorman Decl.; Smith Decl.; Middleton Decl.; Mirkovski Decl. Netflix also incorporates the arguments in Hulu's opposition brief. Finally, all emphasis is added, and all quotations and citations are omitted herein.

1

a city's residents can watch Netflix content in *other* cities and using Internet service providers ("ISPs") that do not access the city's ROWs.  Indeed, Plaintiff uses the franchise fees it already receives as "general funds" and refers to them as "taxes," making Plaintiff especially vulnerable to a defense under the Internet Tax Freedom Act ("ITFA").  Plaintiff also admits it seeks *discretion* to impose a fee on Netflix content but not on the content of other similar situated providers, in violation of the First Amendment.

Commonality, cohesion, and predominance are also lacking.  Determining whether two unique Defendants provide "video service" requires city-by-city inquiries.  Even if Netflix were the only Defendant, Netflix does not know where its customers reside.  It also cannot be determined on a classwide basis which public ROWs a city owns, whether those ROWs have wires through which ISPs *could* deliver Netflix content, or whether content is *in fact* delivered through those wires as opposed to through satellite, mobile, fixed wireless, or other services exempted from the Act.  Fact-intensive questions also exist as to whether each city relinquished its right to seek fees based on its prior knowledge of Netflix's service.  Calculating classwide damages is an impossible feat, and Plaintiff's damages theory is inconsistent with its liability theory.  Class litigation is neither manageable nor superior, and the Court should deny Plaintiff's motion.

## I.     STATEMENT OF ISSUES

Netflix adopts Plaintiff's Statement of Issues.

## II.    PLAINTIFF'S CLASS CERTIFICATION MOTION SHOULD BE DENIED

The Court can certify Plaintiff's proposed class only if, after a "rigorous analysis," it is satisfied that Plaintiff has met its burden on each of the prerequisites for certification.[2]  *Pipefitters*

---

[2] Plaintiff did not seek to take a single deposition, did not serve written discovery until April 8, 2021, and filed its motion without any written discovery responses.  It relies only on two experts who testified they are ***not*** opining on the points for which Plaintiff cites them, as shown in the

*Loc. 636 Ins. Fund v. Blue Cross Blue Shield of Michigan*, 654 F.3d 618, 629 (6th Cir. 2011); *In re Am. Med. Sys.,* 75 F.3d 1069, 1078-79 (6th Cir. 1996). Plaintiff plainly has not met its burden.

### A.    The Proposed Class Is Impermissibly Fail-Safe, And Numerosity Is Lacking

"[A] class definition is impermissible where it is a 'fail-safe' class, that is, a class that cannot be defined until the case is resolved on its merits." *Sherrod v. Enigma Software Grp.*, 2016 WL 25979, at *4 (S.D. Ohio 2016). Such a class improperly "shields the putative class members from receiving an adverse judgment. Either the class members win or, by virtue of losing, they are not in the class and, therefore, not bound by the judgment." *Randleman v. Fidelity Nat'l Title Ins.*, 646 F.3d 347, 352 (6th Cir. 2011) (rejecting class definition). Plaintiff proposes a class of "[a]ll Ohio municipalities in which one or more of the Defendants **has provided video service**," and it defines "video service" based on Ohio's statutory definition. Mem. 3, 7; Compl. ¶¶ 9 n.1, 24. Whether Netflix or Hulu has "provided video service" in a particular city, such that the city is a proposed class member, requires a city-by-city determination on key ***merits*** issues, including whether (1) Defendants provide "video programming" (as statutorily defined) in the city, (2) "over wires or cables located at least in part in public rights-of-way" of the city; (3) but *not* to "subscribers to commercial mobile service"; and (4) *not* "over the public internet." O.R.C. § 1332.21(J). Plaintiff thus proposes an improper, fail-safe class.[3] *Randleman*, 646 F.3d at 352; *Sauter v. CVS*, 2014 WL 1814076, at *9 (S.D. Ohio 2014).

Plaintiff's improper class definition also defeats numerosity because Plaintiff fails to show which Ohio municipalities are municipalities "*in which one or more Defendants provide video*

---

attached Chart & Excerpts of Plaintiff's Experts' Testimony (Ex. 1).

[3] Plaintiff concedes that "[w]hether Defendants provide video service" is a merits question. Mem. 9. Plaintiff also wrongly asserts class members "can be readily ascertained from the State of Ohio Census Bureau," which does not identify cities "*in which one or more of the Defendants have provided video service*." *See* Mem. 7.

*service*."[4]  *Vega v. T-Mobile USA*, 564 F.3d 1256, 1267 (11th Cir. 2009) (finding record "utterly

devoid of any showing" on numerosity); *Schilling v. Kenton Cty., Ky.*, 2011 WL 293759, at *8

(E.D. Ky. 2011) (numerosity lacking where "proposed [class] definition [was] wholly dependent

on a merits-based resolution of each potential class members' claims").[5]

### B.      Plaintiff Is Not An Adequate Class Representative

Adequacy of representation "is essential to due process, because a final judgment in a class

action is binding on all class members."  *In re Am. Med. Sys.*, 75 F.3d at 1083.  Plaintiff is an

inadequate representative because its "interests conflict with the interests of part or all of the

proposed class."  *Schlaud v. Snyder*, 785 F.3d 1119, 1125 (6th Cir. 2015).  The Act permits each

city to collect a percentage of a video service provider's gross revenue collected "for video service"

from subscribers "having service addresses" within the city, but it does not define "service

address."  O.R.C. § 1332.32(B)(1).  Plaintiff seeks to define "service address"—without support—

as "the residential address of the subscriber."  Pl.'s Resp. to Interrogatories (Ex. 10) at No. 17.

Under Plaintiff's model, gross revenue for purposes of assessing a fee is determined by adding up

---

[4] Plaintiff's experts are *not* opining that Netflix provides video programming under the Act and do *not* know if Netflix has facilities in Ohio ROWs.  Malfara Tr. (Ex. 6) 75:23, 84:25-85:2, 104:24-105:2, 108:23-25, 112:8-22, 119:14-21, 132:2-16, 168:19-21, 169:2-4; Simon Tr. (Ex. 7) 62:6-9, 117:12-23. Netflix will show that it does not provide "video service" *anywhere*.  Netflix does not provide "programming": its content is not live, channeled, or linear, and it is not subject to FCC rules applicable to broadcast television stations, cable operators, or a "multichannel video programming distributor," as Mr. Middleton, Netflix Lead, U.S. Federal Policy and former FCC attorney, explains.  Simon Tr. 95:25-98:8, 101:4-7, 103:22-24, 104:21-105:6, 130:20-132:20, 133:5-8, 138:21-139:8, 140:8-19, 165:15-166:16, 169:7-170:21, 171:3-10, 172:3-6, 175:15-25, 179:25-181:20; Middleton Decl. ¶¶ 3-8; Long Decl. ¶¶ 3-8; Op. & Order (Ex. 9) 12-14.  Netflix does not own, operate, or use any wires in any public ROWs, and its content is streamed by subscribers to commercial mobile service and over the public Internet.  Smith Decl. ¶¶ 6-14; S. Turner Report (Ex. 4) ¶¶ 38-50, 83-84; Malfara Tr. 107:5-21, 108:23-25; Simon Tr. 75:15-25; O.R.C. § 1332.21(J).

[5] Plaintiff also claims the proposed class includes *all* of the 2,246 "cities and townships" in Ohio (Mem. 7-8), but *none* of the 1,308 townships that Plaintiff references are in the proposed class, which includes only "Ohio municipalities" and not "townships."  *See* O.R.C. tit. 5, tit. 7.

all subscription fees paid by customers with residential addresses in a particular city, *even if* those customers do not stream all, or any, Netflix content at that address or in that city.  Mem. 5.  Reciprocally, under Plaintiff's model, a city is *not* entitled to a percentage of the gross revenue associated with content streamed by *non-residents within* that city (e.g., tourists, business travelers, students), *even if* that content is delivered through the wires or cables in that city's ROWs.

Cities like Plaintiff—which have no hotels or tourist attractions and relatively few visiting non-residents—benefit from Plaintiff's model, but the model disadvantages other members of the proposed class (as Dr. Jesse David, an economist with a Ph.D from Stanford University, explains).  *See* J. David Report (Ex. 5) ¶¶ 62-82; Blackwell Tr. (Ex. 8) 14:21-15:2.  "Service address" generally refers to the location where service is provided, not residential address (as Mr. Turner, who has worked in the telecommunications industry for over 30 years, explains).  Turner Report ¶¶ 51-54; Malfara Tr. 99:1-2 ("A service address in general is where a service is being consumed.").  If that concept were applied here, "service address" would be the location(s) where content is streamed through wires or cables in the public ROWs, regardless of residential (or billing) address.  Turner Report ¶¶ 51-56.  Under that definition, a city would be entitled to a fee assessed against all gross revenues associated with video programming provided over wires or cables in the city's public ROWs, *regardless of whether* that programming is watched by residents or non-residents in the city.  *See* O.R.C. §§ 1332.21(J); 1332.32(B)(1).  Cities with large non-resident populations would receive more benefit under this model, as they could seek to recover fees related to content streamed not only by residents but also tourists, business travelers, college students, and other visitors in the city—fees they would not receive under Plaintiff's model.  David Report ¶¶ 66-82 (illustrative case studies); Gorman Decl. ¶ 4 (Netflix subscribers with Ohio billing zip codes watched content using IP addresses associated with almost five different cities in four-

week period); Malfara Tr. 70:7-71:7.  Plaintiff's interests thus conflict with the interests of other members of the proposed class, making Plaintiff an inadequate class representative.  *Amchem Products v. Windsor*, 521 U.S. 591, 626 (1997); *Cox v. TeleTech@Home*, 2015 WL 500593, at *7 (N.D. Ohio 2015) (Gwin, J.).

The conflict of interest between Plaintiff and other members of the proposed class are especially problematic here, where Plaintiff seeks to certify a "mandatory" class under Rule 23(b)(2), which does not require that class members be given notice and an opportunity to object or to opt out and avoid being bound by a final judgment.  *Romberio v. UnumProvident*, 385 F. App'x 423, 432 (6th Cir. 2009); *see also Ball v. Kasich*, 307 F. Supp. 3d 701, 718 (S.D. Ohio 2018).  Plaintiff's Mayor, who has decision-making authority for this lawsuit, did not consult any other city regarding this lawsuit or the goal of raising revenues from each city's residents. Blackwell Tr. 143:21-23, 144:12-19, 163:20-22, 167:1-3, 176:12-19.  She instead is acting "solely based on what [she] believes [is] fair and best for the City of Maple Heights," and she has not "taken into account" what other cities "may want to do."  *Id.* at 147:17-20, 167:1-3.  Yet, she has "no problem" forcing other cities into this action; making "decision[s] for the other cities"; and "seeking these fees even if it means the residents of other cities will now have to pay more for certain other subscriptions," that it "may violate the First Amendment," and that it "may subject [the other cities] to counterclaims."  *Id.* at 168:2-13, 169:8-21.

Many Ohio cities have already rejected efforts to increase taxes/fees paid by their residents, as shown in the attached Chart of City Rejections of Tax Hikes (Ex. 2).  As one Cincinnati Councilwoman stated, "[t]he idea of raising taxes during the pandemic is really tough."  *Id.* at 4. By attempting to force all Ohio cities to expand application of their franchise ordinances to internet content providers like Netflix and Hulu, thereby drastically increasing the fees their residents pay,

6

Plaintiff is not adequately representing the class it seeks to certify.  *See* O.R.C. § 1332.32(D) (fee may be passed on to customers); *Schlaud*, 785 F.3d at 1127.

### C.  Plaintiff's Claims Are Not Typical Of Those Of The Proposed Class

Where "a class definition encompasses many individuals who have no claim at all to the relief requested, or where there are defenses unique to the individual claims of the class members," typicality is lacking.  *Romberio*, 385 F. App'x at 431. Typicality is lacking here.

*First*, Plaintiff is especially susceptible to a defense based on the ITFA.  Netflix argues that the fee under the Act is a "tax" that violates the ITFA, because the fee is used for "general purposes" and does not relate to a specific privilege provided to it.  Mot. to Dismiss at 13-14; Counterclaim ¶¶ 49-50.  Plaintiff asserts the fee is not a "tax," because it is for the privilege of, and as rent for, using the public ROWs.  Response to Hulu's Mot. to Dismiss (Dkt. 33) at 9-12. But Plaintiff admits it has not given Netflix a specific privilege, has not been impacted by Netflix, and channels the franchise "Tax" into its "General Fund."  Blackwell Tr. 64:19-22, 75:12-17, 83:9-84:3,112:19-113:5; 2019 Audit Report (Ex. 11) at 19, 21.  Moreover, by defining "service address" to refer to residential address regardless of where or how content is viewed, Plaintiff espouses a damages theory that divorces the franchise fee from the actual use of wires in the public ROWs. *Supra* at 4-6.  Plaintiff's chosen theory renders it susceptible to the defense that the fee is not merely rent for use of the ROWs but instead a tax "for the purpose of generating revenues for governmental purposes."  47 U.S.C. § 151 (note), § 1105(8); *see also* Mot. to Dismiss at 13-15.

*Second*, Plaintiff is subject to the argument that it is seeking to violate the First Amendment and the Fourteenth Amendment's Due Process Clause, under which "speakers are protected from arbitrary and discriminatory enforcement of vague standards."  *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 588 (1998).  Plaintiff openly believes imposition of the fee should be based on an analysis of the quality, format, and genre *of the content* and that such a *content*-based

approach is appropriate. Blackwell Tr. 175:11-176:7; *see also* Simon Tr. 230:17-231:2, 238:22-239:5, 240:3-20, 247:14-23. The Mayor also testified she has discretion to seek a fee only from Netflix and Hulu and not similarly situated content providers, that all similarly situated providers are not parties to this suit, and that she believes this approach is fair, even though it is inconsistent with Plaintiff's standard policy of enforcing rules against similarly situated parties all at once. Blackwell Tr. 126:6-17, 145:23-146:17, 155:12-157:8, 185:2-9, 186:11-14; *see also* Pl.'s Resp. to Interrogatories at Nos. 14-15; *but see* Simon Tr. 246:2-6, 261:20-262:3.

*Finally*, even setting aside these defenses, the presence of individualized issues (*infra* at 8-13) defeats typicality because even if Plaintiff were to "prove[] [its] own claim," it "would not necessarily have proved anybody else's claim." *Sprague v. General Motors*, 133 F.3d 388, 399 (6th Cir. 1998); *see also Ball v. Union Carbide*, 385 F.3d 713, 728 (6th Cir. 2004).

### D. Plaintiff Has Not Satisfied And Cannot Satisfy Commonality, Much Less Predominance Or Cohesion

Plaintiff cannot show commonality, which requires "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Davis v. Cintas Corp.*, 717 F.3d 476, 487 (6th Cir. 2013); *see also Sprague*, 133 F.3d at 398-99.

*Whether And When Each City Enacted A Franchise Ordinance Requires Individualized Inquiry:* The Act does not impose a universal fee, and liability will not exist with respect to a particular city unless it has enacted an ordinance that specifies the relevant percentage to be paid. O.R.C. § 1332.32(C)(1)(b). The Court or jury will thus have to determine—for *each* city—whether (and when) it enacted an ordinance implementing a fee, what the fee percentage is, and to which revenues the ordinance applies.[6] *Compare, e.g.*, Alliance Codified Ordinances § 775.01

---

[6] Many cities (*e.g.*, Fremont, Euclid, Youngstown, and Canton) have *not* enacted an ordinance, meaning the class definition "sweeps within it [entities that] could not have been injured." *Kohen v. Pac. Inv. Mgmt.*, 571 F.3d 672, 677 (7th Cir. 2009); *see also Phillips v. Philip Morris*, 298

(Ex. 12) (5% fee, including on advertising revenue), *with* Barnesville Codified Ordinances § 795.01 (Ex. 13) (3% fee, not on advertising revenue), *and* Independence Codified Ordinances § 775.01 (Ex. 14) (0% fee); *see also* O.R.C. §§ 1332.32(B)(2)(g), 1332.32(C)(1)(b).

*Netflix Does Not Know Where Subscribers Reside:* Because customers can stream content wherever they are, Netflix does not have its streaming customers' residential addresses and, following established privacy principles, does not collect data that it does not need.  Long Decl. ¶¶ 15-18.  Netflix thus does not know which subscribers have residential addresses in each city.

*Classwide Proceedings Cannot Generate Any Common Answers With Respect To Two Unique Defendants:* Plaintiff wrongly asserts that a classwide proceeding will generate answers to questions of fact and law common to *both* Netflix *and* Hulu.  Mem. 8-9.  All of the questions that Plaintiff identifies depend on whether "Defendants" provide "video service" (or some component thereof).  *Id.* at 7-8; O.R.C. § 1332.21(J).  But Netflix and Hulu are independent companies that offer unique services, use proprietary technologies, and have unique subscribers. Long Decl. ¶¶ 3, 14; Malfara Tr. 133:23-134:17, 141:13-18; Simon Tr. 106:11-108:8.  As a result, determining (1) whether Netflix *and* Hulu provide "video programming," (2) whether Netflix *and* Hulu do so "over wires or cables located at least in part in public rights-of-way," (3) whether the video content of Netflix *and* Hulu is provided to "subscribers to commercial mobile service," (4) whether the video content of Netflix *and* Hulu is "offered over the public internet," and (5) the number and location of Netflix *and* Hulu's subscribers cannot be answered based on common proof.

Plaintiff's experts admit that Netflix and Hulu do not offer the "same content," do not "transmit their content in the same manner," and use "mutually exclusive" servers.  Malfara Tr.

_____

F.R.D. 355, 365 (N.D. Ohio 2014).  This defeats commonality and typicality.

9

134:14-17, 180:13-16, 133:23-134:2; *see also* Simon Tr. 60:21-62:1.[7]  Netflix offers **no** live or channeled content, while Hulu offers live feeds from local television and cable channels, making the determination of whether each Defendant offers "video programming" different.  Simon Report (Dkt. 54-2) ¶ 34; Simon Tr. 107:4-108:3; Long Decl. ¶¶ 4-6; Turner Report ¶¶ 20-21, 25; 47 U.S.C. § 522(20); O.R.C. § 1332.21(I).  Netflix has its own content delivery network, while Hulu uses third-party networks, making determinations regarding the delivery of content different.  Malfara Tr. 140:22-141:18, 170:9-22, 223:6-24.  Defendants have not engaged in a "single course of conduct," and commonality is lacking.  *Ball*, 385 F.3d at 728.

**No Common Questions Exist Even With Respect To Just Netflix, And Individualized Issues Predominate:**  Whether Netflix provides "video service" in any particular city requires a city-specific investigation.  Whether Netflix's content is delivered over a particular city's public ROWs first requires knowing whether that city owns any public ROWs.  Public ROWs in Ohio can be owned by the State and not by local authority, and thus whether a ROW is owned by a proposed class member cannot be determined on a class-wide basis.  Malfara Tr. 191:1-4 ("rights-of-way are not necessarily held by a local governmental authority but [are] held by the [S]tate"); *id.* 239:7-17.[8]  Indeed, Plaintiff's Mayor does not know which ROWs in the city are owned by the city versus the State.  Blackwell Tr. 96:23-97:8.

---

[7] Plaintiff's experts admit they are **not** opining "that Netflix and Hulu provide the exact same video programming," "that Netflix and Hulu provide video programming delivered in the exact same manner," or that Netflix and Hulu do so "no matter where their subscribers reside in the state of Ohio."  Malfara Tr. 179:5-18; Simon Tr. 60:25-61:10, 61:15-20.  They also are not opining whether the determination of whether Netflix and Hulu provide video service under the Act could be answered in a common way for all Ohio cities.  Malfara Tr. 178:17-22; Simon Tr. 59:22-60:1, 105:15-20; Chart & Excerpts of Pl.'s Experts' Testimony (Ex. 1).

[8] *See also, e.g.,* O.R.C. § 306.04(C)(15)(a) (referring to "rights-of-way . . . belonging to the state or to a municipal corporation"); Centerville, Ohio, *Public Right of Way*, https://www.centervilleohio.gov/government/public-works/public-right-of-way (similar).

Even if all cities owned public ROWs, individualized proof would still be needed to resolve numerous factual issues before the Court or jury could determine whether the public ROWs in a particular city are used to deliver Netflix content, as industry expert Mr. Turner explains.   Turner Report ¶¶ 57-88.  Plaintiff's expert, Mr. Malfara, agrees that such a determination would require "further investigation."  Malfara Tr. 245:9-13.  ***First***, certain cities, especially in rural areas, "do not have broadband Internet access" through wires or cables, such that determining which cities have wires or cables in their public ROWs through which content *could even potentially* be streamed requires individualized inquiry.  Malfara Tr. 24:16-18; Turner Report ¶ 59 (listing Ohio cities without broadband Internet).  As Mr. Malfara testified, this would require evaluating the "names of [ISPs]," "route maps of [ISPs]," and "logs of permits that were requested in order to construct facilities."  Malfara Tr. 109:8-17; *see also id.* at 187:7-20; 236:2-15.

***Second***, even in cities where certain ISPs do have wires or cables in the city's ROWs, determining whether and to whom *those* ISPs deliver Netflix content *over those wires or cables* would require individualized inquiries.  Plaintiff has not conducted this analysis (Blackwell Tr. 101:17-102:1, 103:16-23; Simon Tr. 109:7-11, 111:20-23), but as Mr. Turner explains, there are more than 125 ISPs providing various types of service to various parts of Ohio, and all Ohio cities are served by ISPs that offer satellite and/or wireless service untethered to wires or cables in the city's public ROWs.  Turner Report ¶¶ 57-75, Fig. 5, Ex. SET-C; Malfara Tr. 143:3-149:5 ("direct satellite" and "[s]hort hop mobile" service may not use wires or cables in public ROWs).  If Netflix subscribers in those cities watch content over non-wired Internet connections, the Netflix service is not "video service," and determining who those subscribers are is a daunting task.  *See* O.R.C. § 1332.21(J).  Without city-specific investigation, there is no way to determine if *any* of the public ROWs are being used in cities with a small number of Netflix subscribers.  Malfara Tr. 243:24-

244:13.  At least 10 Ohio zip codes have fewer than 20 Netflix subscribers (by billing zip code), and individualized inquiries would be required to determine if the public ROWs are implicated at all.  David Report ¶ 37 n.49.  Even in jurisdictions with a greater number of Netflix subscribers, the Court or jury would need to determine the percentage of viewers watching content over a wired ISP connection versus a non-wired ISP connection, since the latter percentage is not receiving "video service" and thus Netflix's revenue from those subscribers cannot be assessed a fee.

*Third*, certain rural ISPs may also be classified as common carriers, and on-demand, interactive video service provided by those ISPs may be exempt from franchise fees.  47 U.S.C. §§ 522(5), 522(7)(C); *Petition of NTCA*, Order, 33 FCC Rcd 5712 ¶ 4 (2018).  It would require individualized inquiries to determine whether and to what extent Netflix content is delivered by these ISPs such that franchise fees could not and would not apply.  Turner Report ¶¶ 85-88.

*Fourth*, "video service" does not include content delivered over mobile service.  O.R.C. § 1332.21(J).  All Ohio cities are served by ISPs that offer mobile service, and determining whether Netflix viewers in each city are streaming content over a mobile connection (and if so how many) would require an inquiry into the users of each city at any particular time.  Turner Report ¶¶ 62, 67-70, 83-84.

*Fifth*, many subscribers have access to both a wired Internet connection and a non-wired or mobile Internet connection.  Turner Report ¶¶ 61-75.  For those subscribers who sometimes watch content over a wired connection and sometimes over a non-wired or mobile connection, the Court or jury would need to determine the portion of content those subscribers do *not* watch over a wired connection and/or *do* watch over a non-wired or mobile network, as such service is not "video service."  It would then need to determine what portion of the subscriber's Netflix subscription fee is associated with the "video service" portion versus what portion is not.  That

12

determination would not only vary by subscriber and then by each city's population, but it would also require some method of allocating portions of revenue (e.g., based on megabits streamed or hours viewed) that the Act does not contemplate or provide.  *See* O.R.C. § 1332.21, *et seq.*

**Sixth**, "video service" does not include content offered over the public Internet.  O.R.C. § 1332.21(J).  While Netflix contends its content is always provided over the public Internet (Smith Decl. ¶¶ 8, 11-13), Plaintiff disputes that fact, and its expert testified that determining whether Netflix content is delivered over the public Internet *cannot* be answered on a classwide basis and instead requires "looking at the facts of each city."  Malfara Tr. 227:13-19; *id.* at 225:11-18.

**Seventh**, calculating damages is not as simple as applying a "statutory formula."  Mem. 15-16.  The statutory fee is applied against certain "revenue . . . that is collected by the provider *for video service* from all its subscribers having service addresses within" the city.  O.R.C. §§ 1332.32(A), 1332.32(B)(1).  Because determining which residents (if any) in each city received video service (and, if so, in what proportion as compared to content that is *not* video service) would require subscriber-by-subscriber and city-by-city inquiry, assessing damages would as well.

These individualized inquiries preclude certification under Rule 23(b)(2), because Netflix's conduct cannot be "enjoined or declared unlawful" "as to all the class members," *Wal-Mart v. Dukes*, 564 U.S. 338, 360 (2011)), the interests of the class are not "cohesive and homogeneous," and the class would be unmanageable.[9]  *Romberio*, 385 F. App'x at 432.  Calculating damages is also not "incidental" and "automatic," Mem. 15-16, and would entail "individualized determinations" incompatible with Rule 23(b)(2).  *Coleman v. Gen. Motors*

---

[9]  Contrary to Plaintiff's assertion (Mem. 13), manageability and judicial economy *are* relevant to 23(b)(2) class actions.  *See Romberio*, 385 F. App'x at 433; *Coleman*, 296 F.3d at 448-49. The cases Plaintiff cites (at 15) (*Berry*, *Amara*, *Johnson*, *Carter*, *J.B-K-1*) are also inapposite because each involved highly formulaic damages.  *Gooch* did not involve a Rule 23(b)(2) damages class, and *Allison declined* to certify a Rule 23(b)(2) damages class given individualized inquiries.

*Acceptance*, 296 F.3d 443, 447 (6th Cir. 2002); *see also Dukes*, 564 U.S. at 360-61; *Davis*, 717 F.3d at 490–91. Similarly, the individualized inquiries required to determine whether Netflix provides "video service" in each city would predominate, defeating certification under Rule 23(b)(3). *See Randleman*, 646 F.3d at 352–53.

### E.    Class Certification Is Improper Under Rule 23(b)(2) For Additional Reasons

Netflix "has the right to present defenses before paying" damages to any city. *Davis*, 717 F.3d at 490–91. Netflix cannot be obligated to pay a fee until a city first "provide[s] written notice to [Netflix] of the . . . [fee] percentage" to be applied. O.R.C. § 1332.32(C)(2). No municipality in Ohio has provided Netflix such notice, Mirkovski Decl. ¶ 2, and the doctrines of laches, waiver, and estoppel further prevent a city from: (1) knowing Netflix was providing service; (2) choosing not to notify Netflix it would impose a fee; (3) thereby inducing Netflix to believe it was not subject to a fee and did not need to pass the fee on to its customers (O.R.C. § 1332.32(D)); and (4) then seeking to impose a fee years later when Netflix may no longer be able to pass it on to customers.[10] The Mayor, for example, has known Netflix service was available in her city for at least six years and testified the city could have, but did not, give notice of its intent to impose a fee. Blackwell Tr. 32:13-19, 176:20-23, 177:17-22, 179:9-19. Many other cities have had varying levels of knowledge of Netflix's service, as set forth in the attached Chart of Notice of Netflix (Ex. 3).[11]

---

[10] *See Citizens for Responsible Green Gov't v. City of Green*, 118 N.E.3d 236, 241 (Ohio 2018) (laches); *Chubb v. Ohio Bur. of Workers' Comp.*, 690 N.E.2d 1267, 1270 (Ohio 1998) (waiver and estoppel). These doctrines may be asserted against governments when doing so would further public-policy interests, *Still v. Hayman*, 794 N.E.2d 751, 755 (Ohio Ct. App. 2003), and here, application of the doctrines ensures that protected content is not unduly burdened by fees, that companies are not dissuaded from investing in Ohio, and that residents are not unfairly forced to pay fees they were not aware would apply.

[11] For example, Pataskala, Ohio, has banned employees from "streaming video for entertainment purposes (e.g. Netflix, YouTube, etc.) on the City's network" since at least 2016. Ex. 22 at 80.

The fact-intensive inquiries related to these and other defenses defeat class certification.[12] *Cruson v. Jackson Nat'l Life Ins.*, 954 F.3d 240, 256 (5th Cir. 2020); *cf. Sprague*, 133 F.3d at 398.

### F.      Class Certification Is Improper Under Rule 23(b)(3) For Additional Reasons

#### 1.      Plaintiff's Damages Method Is Inconsistent With Its Liability Theory

Plaintiff has not presented a method for calculating damages that "measure[s] only those damages attributable to [its liability] theory." *Comcast*, 569 U.S. at 35.  Plaintiff alleges that Netflix owes a percentage of gross revenues "***derived from*** . . . ***providing video service in that municipality***," Compl. ¶ 2, *see also id.* ¶¶ 20, 35, 40(e), which demands a damages model that determines the portion of Netflix's revenue associated with providing video programming through wires or cables in each city's public ROWs, and not over mobile service or the public Internet. O.R.C. § 1332.21(J); 1332.32(B)(1).  Plaintiff instead proposes a damages model based on Defendants' gross revenues "***derived from subscribers with [residential] addresses*** within the municipality." Mem. 11; Pl.'s Resp. to Interrogatories at No. 17.  Plaintiff's damages model turns on subscribers' residential addresses, "***regardless of*** whether Defendants' video programming is viewed by [city] residents outside the City, by non-residents inside the City, or by residents via mobile devices."  Mem. 5.  That model is inconsistent with Plaintiff's liability theory (David Report ¶¶ 32-34), and *Comcast* thus prohibits certification under Rule 23(b)(3).[13]

---

[12] For example, Netflix is also entitled to defend itself under the ITFA, the Dormant Commerce Clause, and the First Amendment based on the way each city characterizes, imposes, apportions, and earmarks its franchise fees.

[13] Plaintiff's model, for example, does not account for the fact that: (1) subscribers can watch Netflix anywhere, in any amount; (2) multiple users can stream content on the same account at the same time in various locations; (3) users can switch between wired and non-wired or mobile ISP connections; and (4) Netflix does not know the city in which any subscriber is viewing content Malfara Tr. 90:20-93:7; Simon Tr. 159:13-19; Gorman Decl. ¶¶ 3-5; Smith Decl. ¶¶ 3-4, 14. Viewing patterns also vary by user and by city, making it impossible to determine on a classwide basis whether Netflix's revenues for its streaming service relate to alleged "video service" in a particular city or not.  Turner Report ¶¶ 76-82; David Report ¶¶ 45-56.

### 2. A Class Action Is Not A Superior Method For Resolving This Dispute

*First*, the individualized inquiries related to liability and damages combined with the conflicts among the class mean "the difficulties of managing a class action" will be substantial, and "a class action cannot be a superior form of adjudication." *Pipefitters*, 654 F.3d at 630–31.

*Second*, "[t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights," *Amchem*, 521 U.S. at 617, and the Court "should consider the value of individual damage awards, as small awards weigh in favor of class suits." *Pipefitters*, 654 F.3d at 631. Each city here is motivated to pursue litigation itself (if it wants to impose fees on its residents) given the large amounts of money at stake. *Cf. Hicks v. State Farm*, 965 F.3d 452, 464 (6th Cir. 2020) (superiority met where damages are less than $1,000). And they may prefer to do so, rather than relinquish 20-30% of any recovery under Plaintiff's (inferior) damages approach to Plaintiff's *counsel*, as often occurs in class actions and as Plaintiff seeks here. *In re Polyurethane Foam*, 168 F. Supp. 3d 985, 1013 (N.D. Ohio 2016); Blackwell Tr. 197:24-198:8.

*Third*, each city, as a distinct government body, may not agree with Plaintiff's attempt to expand the scope of the Act to apply to potentially every online video content provider (e.g., Amazon Prime, ESPN+, YouTube) that its residents use, thereby drastically increasing the fees its residents pay. *See* Chart of City Rejections of Tax Hikes (Ex. 2); O.R.C. § 1332.32(D); *supra* at 6-7. It is improper to permit the class vehicle to supplant the legislative function of each city.

*Fourth*, it is improper to circumvent the Ohio Legislature and expand the scope of the Act through class litigation. This is especially so given that expanding the Act to Netflix would exempt Netflix from state and county sales tax, depriving the State and counties of millions of dollars in tax revenue they currently receive. O.R.C. §§ 5739.02(B)(53); 5739.026(F); Mirkovski Decl. ¶ 3.

Netflix respectfully requests the Court deny Plaintiff's Motion for Class Certification.

16

Dated: May 17, 2021

Respectfully submitted,

/s/ Gregory C. Djordjevic

Amanda Martinsek (0058567)
Gregory C. Djordjevic (0095943)
ULMER & BERNE LLP
1660 West 2nd Street, Suite 1100
Cleveland, Ohio 44113-1448
Tel.: 216-583-7000 / Fax: 216-583-7001
Email: amartinsek@ulmer.com

Jean A. Pawlow (pro hac vice)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Tel.: 202-637-2200/Fax: 202-637-2201
Email: jean.pawlow@lw.com

Mary Rose Alexander (pro hac vice)
Robert C. Collins III (pro hac vice)
LATHAM & WATKINS LLP
330 North Wabash Ave., Suite 2800
Chicago, IL 60611
Tel.: 312-876-7700/Fax: 312-993-9767
Email: mary.rose.alexander@lw.com
Email: robert.collins@lw.com

*Counsel for Defendant Netflix, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on May 17, 2021, a copy of the foregoing was filed electronically and sent to all counsel of record by operation of the Court's CM/ECF System.

*/s/ Gregory C. Djordjevic*
*Counsel for Defendant Netflix, Inc.*